**Patrick James JEFFRIES, Petitioner,**

v.

**James BLODGETT, Respondent.**

**No. C90–925D.**

United States District Court,
W.D. Washington,
at Seattle.

April 15, 1991.

On Motion For Summary Judgment
Sept. 5, 1991.

See also, 105 Wash.2d 398, 717 P.2d 722.

Brian R. Phillips, Everett, Wash., Stephanie Ross, Point Roberts, Wash., for petitioner.

Linda Anne Dalton, Paul Douglas Weisser, Atty. General's Office, Corrections Div., Olympia, Wash., for respondent.

## ORDER

DIMMICK, District Judge.

Petitioner, in addition to filing a memorandum in opposition to respondent's motion for summary judgment, has filed separate motions for: (1) additional discovery, (2) expansion of the record, and (3) an evidentiary hearing on certain issues raised in his request for habeas corpus relief. On March 13, 1991, the Court heard oral argument on these motions and on the question of whether certain claims made by the peti-

tioner in his habeas corpus petition are precluded from federal court review. The Court has reviewed the memoranda and affidavits submitted by counsel on these issues and hereby grants petitioner's motions for an evidentiary hearing, for discovery, and to expand the record as outlined below. The Court declines to grant partial summary judgment in favor of the respondent on the procedural bar issue.

## DISCUSSION

### A. *Procedural Bar*

■ Respondent requests that the Court decline to consider certain claims raised in the habeas petition on the grounds that they are precluded from federal court review by the "procedural bar" doctrine. The essential requirements of the procedural bar doctrine are well established and undisputed by the parties. Briefly, a federal habeas corpus court may not review a federal habeas corpus petitioner's federal claims where the state court has refused to rule on the merits of the federal claims because of an independent and adequate state procedural rule—absent cause for and prejudice from default. *See, e.g., Engle v. Isaac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). In order to bar federal habeas corpus review, the state procedural rule must be a "clearly announced rule that state courts apply evenhandedly to dispose of similar claims." *County Court of Ulster County v. Allen*, 442 U.S. 140, 154, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979); *Kreck v. Spalding*, 721 F.2d 1229, 1234 (9th Cir.1983).

In *In re Jeffries*, 114 Wash.2d 485, 789 P.2d 731 (1990) (*"Jeffries IV"*), the Washington State Supreme Court declined to consider five issues raised by the petitioner in his third personal restraint petition. The Supreme Court held that raising these issues constituted an "abuse of the writ" because the petitioner could have, but did not, raise those issues in a previous petition. The precluded claims were:

(6.5) Newly Discovered Evidence

(6.6) Prejudicial Testimony

(7.1) Mitigating Circumstances

(7.2) "Having in Mind the Crime"

(7.7) Waiver of Right to Counsel

At issue in the present action is whether the Supreme Court's decision not to consider these issues constituted the creation of a new procedural rule, a rule that was not "clearly announced" before.

The dispute here centers on the language of Washington Rule of Appellate Procedure 16.4(d), which states: "No more than one petition for similar relief on behalf of the same petitioner will be entertained without good cause shown." In *In re Haverty*, 101 Wash.2d 498, 503, 681 P.2d 835 (1984), the Washington Supreme Court explicitly adopted a new rule interpreting RAP 16.4(d). In doing so, the Court overruled the holding of a previous case, *In re Haynes*, 95 Wash.2d 648, 628 P.2d 809 (1981), and adopted the analysis of a federal case, *Sanders v. United States*, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963).

The new interpretation of RAP 16.4(d), adopted by the Court in *Haverty* stated that:

> [T]here were only two limited instances in which successive petitions could be dismissed: (1) where the prior application had been denied on "grounds previously heard and determined"; or (2) "if there had been an abuse of the writ or motion remedy."

(quoting *Sanders*, 373 U.S. at 15, 17, 83 S.Ct. at 1077, 1078). The Court then defined the terms "heard and determined"—the standard for the first ground for dismissal. However, the Court neither addressed nor defined the second instance warranting dismissal—the abuse of the writ standard.

The Supreme Court did not consider this issue again until Jeffries' third personal restraint petition was filed (*Jeffries IV*).[1]

---

1. The Court did address a related issue in *In re Taylor*, 105 Wash.2d 683, 717 P.2d 755 (1986). In *Taylor*, the Supreme Court extended its holding in *Haverty* concerning "renewed" claims. *Haverty* had only addressed the effect of raising an issue that had been previously considered in another personal restraint petition. *Taylor* extended that holding to preclude consideration of issues raised in a personal restraint petition if those same issues had been considered on direct

The Supreme Court noted that Jeffries' third personal restraint petition contained a mixture of "renewed" and "new" claims. As regards the renewed claims, the Court applied the previously defined standard for dismissing "heard and determined" claims and noted that any such claims would not be considered except for good cause shown. Applying this standard, the Court dismissed four of the five renewed claims submitted by the petitioner. The one renewed claim that was considered—the proportionality review of the sentence—was dismissed on the merits.

Turning to the "new" issues raised in the personal restraint petition, the Court stated that:

> As noted above, we will not consider even a "new" issue raised in a successive petition if the petitioner abuses the writ by raising that issue. *In re Haverty* (following *Sanders v. United States*).

(Footnotes omitted.) The Court went on to say:

> We hold only that, if the petitioner was represented by counsel throughout the post conviction proceedings, it is an abuse of the writ for him or her to raise, in a successive petition, a new issue that was "available but not relied upon in a prior petition."

Applying this test, the Court dismissed each of petitioner's five new claims as an abuse of the writ.

Thus, prior to *Jeffries IV*, the Supreme Court in *Haverty* had defined what it meant to raise a "similar" issue under RAP 16.4(d), but had not defined the effect of raising a "new" issue in a personal restraint petition. All that had been clearly stated concerning new issues was that it was improper to raise issues that "abused the writ." What constituted such abuse was unclear until the Supreme Court in *Jeffries IV* defined at least one aspect of abuse as failing to raise an issue that could have been raised previously.

■ Given this sequence of events, this Court does not believe that it is reasonable to conclude that there was a "clearly an-

nounced" procedural rule in Washington State concerning the raising of new issues in personal restraint petitions. Rather, the scope of the rule in question was defined within the context of the Court's decision not to consider certain issues raised by the petitioner.

The conclusion that there is no clearly established procedural rule interpreting RAP 16.4(d) is supported by an unpublished Order recently issued by the Washington Supreme Court in *In re Campbell*, No. 57406 (March 21, 1991). In that Order, the Supreme Court considered the merits of issues raised in a personal restraint petition. The State had contended that, pursuant to *Haverty*, *Taylor*, and *Jeffries IV*, consideration of these claims was procedurally barred. In response, the Supreme Court stated that "[w]hile the State's position may be well-taken, the court nonetheless has reviewed, and hereby rejects, each of Mr. Campbell's claims on the merits." *Id.* at 2.

The Supreme Court's decision in *Campbell* to ignore the effect of the procedural bar rule indicates either (1) that the Washington Supreme Court does not believe there is a settled procedural bar rule, or (2) that the rule is not evenly enforced—precluding review in some cases but not in others. In either case, it cannot be said that there is a clearly announced and fairly applied procedural rule concerning new issues raised in personal restraint petitions.

Because there was no clearly announced procedural rule that precluded the state court from considering the five new issues outlined above, the Court concludes that the procedural bar doctrine is not controlling in the present case. The Court will therefore consider the constitutional issues raised by the petitioner in claims 6.5, 6.6, 7.1, 7.2, and 7.7.

### B. *Petitioner's Motion for an Evidentiary Hearing*

■ Petitioner requests an evidentiary hearing on the following issues: failure to change venue/jury misconduct (6.1); newly

---

appeal. *Taylor*, however, did not address the

effect of raising a "new" ground for relief.

discovered evidence (6.5); prejudicial testimony—petitioner in jail (6.6); weapons unrelated to charged offense (6.7); ineffective assistance of counsel (7.6); waiver of right to counsel (7.7); trial judge report (7.10).

The respondent agrees that an evidentiary hearing is required on claim 6.1 (jury misconduct), but objects to an evidentiary hearing on the remaining claims. Respondent concedes that the decision as to whether an evidentiary hearing is appropriate is a decision for the Court.

After a preliminary review of the memoranda, affidavits, and the record of the state court proceedings, the Court concludes that an evidentiary hearing on the issues requested by petitioner is appropriate. THE COURT INTENDS THAT THIS EVIDENTIARY HEARING BE NARROWLY FOCUSED. The Court is not interested in relitigating factual issues that have been properly determined at the state court level. Any attempt by the petitioner to expand the hearing beyond the above listed collateral attacks will be denied. In addition, the restrictions on discovery—discussed below—are intended to limit extraneous material from being introduced at the hearing.

At this time, the Court is primarily interested in claims 6.1 (failure to change venue/jury misconduct); 6.5 (newly discovered evidence); and 7.7 (waiver of right to counsel). The petitioner is, of course, free to direct his energies where he believes it most fruitful.

The Court will set aside one full day for an evidentiary hearing on the above claims. Additional time will not be granted petitioner absent exceptional circumstances. The hearing is scheduled for Wednesday, June 26, 1991 at 9 a.m. No pre-hearing briefs need be submitted.

### C. *Petitioner's Motion for Discovery*

Petitioner has made a broad and far-reaching request for additional discovery. The request includes, but is not limited to, the following: all exculpatory evidence known to the respondent; all information obtained during the original criminal investigation; all information concerning various interviews conducted by the state; any information relating to the criminal record of the victims; all information relating to the possible removal of evidence from the scene of the crime; all information relating to the arrest and incarceration of Dan Helland, a State witness; and information relating to contacts between the trial bailiff and the prosecution, jurors or media.

In addition, the petitioner requests the opportunity to conduct the depositions of certain FBI agents, Clallam County detectives, Wenatchee Sheriff Department officers, the trial bailiff, legal/psychiatric experts obtained by the respondent, and all of the jurors and alternate jurors in this case.

 The decision to permit discovery for good cause shown is at the discretion of the Court. Rule 6(a) of the Rules Governing Section 2254 Cases. The Court is willing to permit limited discovery as it relates to those issues to be considered at the evidentiary hearing. However, any such discovery is to be limited to that information which the petitioner is unable to obtain through other means (*i.e.*, there need be no depositions of individuals who are willing and able to speak to petitioner's counsel).

 Discovery beyond the scope of the scheduled evidentiary hearing is premature. Respondent's motion for summary judgment is necessarily predicated upon the assumption that there are no disputed material facts. Summary judgment in favor of the respondent will not be appropriate on any issue properly before the Court for which petitioner can demonstrate that there is factual uncertainty concerning material issues. If respondent's motion for summary judgment is denied, then additional discovery may be appropriate.

In order to expedite the limited discovery permitted, the Court directs counsel for the respondent and petitioner to confer and agree on the broad outline that discovery will take. The parties are to agree as to what information is relevant to the issues to be heard at the hearing. In addition, respondent may be able to provide the petitioner with certain information without the necessity of formal discovery. A joint sta-

tus report summarizing the agreed upon scope of discovery, and noting any obvious areas of disagreement, is to be submitted to the Court within twenty (20) days of the date of this Order. Upon receipt of this status report, the Court will review the areas of dispute and, if necessary, resolve them.

### D. *Petitioner's Motion for Expansion of the Record*

Petitioner moves to expand the record by including the following: all exhibits admitted at trial; certain newspapers containing articles relating to this case; all affidavits submitted by petitioner and attached to petitioner's response to the motion for summary judgment; all information and materials obtained through discovery; all guilt and penalty phase instructions requested by petitioner or respondent; and any other material the Court deems necessary.

 Expansion of the record is at the discretion of this Court. Rule 7(a) of the Rules Governing Section 2254 Cases. At oral argument on the pending motions, counsel for petitioner stated that the request to expand the record would be satisfied by an evidentiary hearing at which exhibits were accepted. Petitioner may submit exhibits that are relevant to the issues to be considered at the evidentiary hearing.

In light of the considerable record already presented, the Court declines to expand the record further. If, after reviewing the motion for summary judgment, it appears that the record is insufficient, then the Court will request that the parties provide any additional information that is required.

### CONCLUSION

THEREFORE, respondent's request that the Court decline to consider claims 6.5, 6.6, 7.1, 7.2, and 7.7 on the grounds that they are procedurally barred is DENIED. Petitioner's motions for an evidentiary hearing, for discovery, and to expand the record are GRANTED IN PART as outlined above.

An evidentiary hearing is hereby scheduled for Wednesday June 26, 1991. Counsel for petitioner and respondent are hereby ORDERED to confer regarding any necessary discovery. The parties are to submit a discovery status report within twenty (20) days of the date of this Order.

### ON MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court on the motion of respondent James Blodgett for summary judgment. The underlying action is a petition for a writ of habeas corpus filed by Patrick James Jeffries.

Jeffries contends that his custody and sentence of death are contrary to the Constitution of the United States. The Court has considered each of the eighteen claims raised in the petition and finds them without merit. The Court therefore grants respondent's motion for summary judgment, denies the petition for a writ of habeas corpus, and dissolves its previously entered stay of execution.

### PROCEDURAL BACKGROUND

A jury found petitioner Jeffries guilty of two counts of aggravated first degree murder on November 5, 1983. The jury also returned a special verdict finding that the state had proven two aggravating factors beyond a reasonable doubt. The aggravating circumstances were: (1) that the murders had been committed to conceal the commission of a crime or to protect or conceal the identity a person committing a crime, and (2) that the murders were part of a common scheme or plan or the result of a single act of the defendant.

A special sentencing proceeding (the "penalty phase") to determine whether the death penalty should be imposed was conducted on November 7, 1983. The jury returned a verdict that there were not sufficient mitigating circumstances to merit leniency. Jeffries was sentenced to death by the Honorable Grant Meiner on November 18, 1983.

Both the guilt and penalty phase of the trial were conducted in Clallam County Superior Court. Petitioner was represented

by Walter Sowa and Mark Mestel. The prosecuting attorney was David Bruneau.

Jeffries' direct appeal to the Washington Supreme Court was denied on March 26, 1986. *State v. Jeffries*, 105 Wash.2d 398, 717 P.2d 722 (1986) (*"Jeffries I"*). A motion for reconsideration was denied by order dated June 3, 1986. Jeffries' application to the United States Supreme Court for a writ of certiorari was denied. Jeffries was represented by Brian Phillips on appeal. The state was represented by Bruneau and Christopher Melly.

A death warrant was issued by Judge Meiner and stayed by the Washington Supreme Court. Jeffries then filed a personal restraint petition with the Washington Supreme Court on December 18, 1985. The petition was rejected by the Washington Supreme Court on July 25, 1986 in an opinion not reported in the Washington Reports. *In re Jeffries*, 722 P.2d 99 (1986) (*"Jeffries II"*).

Jeffries' second personal restraint petition was argued to the Washington Supreme Court on September 15, 1987. The Washington Supreme Court denied this petition on April 7, 1988. *In re Jeffries*, 110 Wash.2d 326, 752 P.2d 1338 (1988) (*"Jeffries III"*). The Washington Supreme Court stayed its mandate for the decision in *Jeffries III* pending a petition for certiorari to the United States Supreme Court. The petition for certiorari was denied.

On March 21, 1989, Jeffries applied for a stay of execution and a petition for writ of habeas corpus in the United States District Court for the Western District of Washington. The case was assigned to this Court (Judge Dimmick) and a hearing was held on March 23, 1989. Jeffries was represented by Brian Phillips and Stephanie Ross. Respondent was represented by Kenneth Eikenberry (Attorney General), Linda Dalton, and John Jones. The Court entered an order granting a stay of execution on March 23, 1989.

Respondent filed a motion to dismiss for failure to exhaust state court remedies on April 21, 1989. Subsequently, Jeffries filed a third personal restraint petition with the Washington Supreme Court on May 12, 1989. On June 1, 1989, the Court dismissed the habeas corpus petition without prejudice and dissolved the stay of execution. Jeffries' third personal restrain petition was considered by the Washington Supreme Court at an en banc administrative conference on November 30, 1989. The petition was denied on April 5, 1990. *In re Jeffries*, 114 Wash.2d 485, 789 P.2d 731 (1990) (*"Jeffries IV"*).

A death warrant was issued on May 24, 1990 by the Clallam County Superior Court. Jeffries filed a petition for writ of habeas corpus on July 12, 1990 in the United States District Court for the Western District of Washington. The petition was again assigned to this Court. Brian Phillips and Stephanie Ross were appointed by the Court to represent Jeffries. Respondent was represented by Kenneth Eikenberry, Linda Dalton, and Paul Weisser. After a hearing on July 6, 1990, the Court entered an order staying execution.

On July 20, 1990, respondent filed a motion to dismiss for failure to exhaust state remedies. After setting a briefing schedule on this motion, the Court heard oral argument on September 10, 1990. At the hearing Jeffries agreed to file an amended petition for a writ of habeas corpus, deleting those claims that had not been properly presented to the state courts. The amended petition was filed on September 18, 1990. A briefing schedule for respondent's dispositive motion was established on October 19, 1990.

Respondent filed the instant motion for summary judgment on November 9, 1990.

Jeffries filed a motion to compel answers to admit or deny each allegation of the amended petition and a motion for an extension of time for filing a response to the motion for summary judgment on December 13, 1990. On December 26, 1990, the Court denied Jeffries' motion to compel, finding that respondent had adequately complied with Rules 4 and 5 of the Rules Governing Section 2254 Cases. The Court granted Jeffries a one-month extension in which to file his response.

On January 25, 1991, Jeffries filed the following motions: (1) for discovery, (2) for expansion of the state court record, and (3) for an evidentiary hearing. On April 4, 1991, the Court heard oral argument on these three motions and on the "procedural bar" issue raised in the motion for summary judgment.

On April 15, 1991, the Court ruled that the procedural bar doctrine does not require the dismissal of claims 6.5, 6.6, 7.1, 7.2 and 7.7 of the amended petition for a writ of habeas corpus. The Court ordered an evidentiary hearing on claims 6.1, 6.5, 6.6, 6.7, 7.6, 7.7 and 7.10. The Court declined to further expand the state court record. The parties were instructed to file an outline of the pre-hearing discovery that they intended to conduct.

By order dated May 20, 1991, the Court resolved several disputes that had arisen between the parties concerning the scope of the discovery being conducted in preparation for the evidentiary hearing. By order dated June 11, 1991, the Court permitted counsel for the respondent to depose Jeffries (with certain restrictions) as well as Jeffries' original trial counsel. Respondent's request for production of trial counsel's entire work file was denied.

On June 26, 1991, an evidentiary hearing was held at which both petitioner and respondent had an opportunity to submit evidence on the following claims: failure to change venue/jury misconduct (6.1); newly discovered evidence (6.5); prejudicial testimony—petitioner in jail (6.6); weapons unrelated to charged offense (6.7); ineffective assistance of counsel (7.6); waiver of right to counsel (7.7); trial judge report (7.10). Petitioner Jeffries was present at the evidentiary hearing, but did not testify. The hearing lasted for two days.

At the conclusion of the evidentiary hearing, the Court ruled on certain oral motions that had been made by the parties. These rulings were memorialized in an order dated June 27, 1991. Respondent's request

for reconsideration of the procedural bar question was denied. Petitioner's request for an opportunity to conduct a mental health exam to determine his mental state at the time of the penalty phase of the trial was denied. Petitioner's request to introduce the testimony of certain experts on the duty of counsel to present mitigating evidence and as an aid in determining the likely jury interpretation of certain jury instructions was also denied. Finally, a date for oral argument on the summary judgment motion was established, as well as deadlines for supplementing the testimony of the evidentiary hearing (a procedure which had been agreed to by the parties) and for filing post-hearing briefs.

Oral argument on respondent's motion for summary judgment was originally scheduled for July 31, 1991. At the request of petitioner's counsel, argument was continued until August 13, 1991.

### STIPULATION AS TO THE STATE RECORD

The parties have stipulated that volumes 1 through 22 of the state court record are complete and authentic. The state record has been transferred to the record in this action and, with the addition of the evidence introduced at the evidentiary hearing, is the basis for this Court's factual findings.

### FACTUAL BACKGROUND

This is a summary of the factual background to the crime for which Jeffries was convicted and an outline of the evidence presented at trial. Additional factual details are presented in the analysis of each specific claim for relief.

Petitioner Patrick James Jeffries is a Canadian citizen. In January of 1983, Jeffries became a houseguest at the home of Phillip and Inez Skiff in Clallam County, Washington.[1] The Skiffs allowed Jeffries to stay with them and permitted him to use their wood shop to continue his interest in

---

**1.** The Skiffs met Jeffries while he was serving a 12–year sentence for armed robbery in Canada. This was Jeffries' 15th conviction in 12 years. Jeffries violated the terms of his Canadian pa-

role when he travelled down to Clallam County in January, 1983. Jeffries' criminal record was kept from the jury by the trial judge, but see claims 6.1 and 6.2 below.

wood carving. Although Jeffries and the Skiffs appeared to have gotten along well, the relationship may have begun to sour in early March, 1983.

Phillip Skiff was last seen, wearing a blue jumpsuit, on the morning of March 19, 1983 by Alfred and Frieda Opdahl, neighbors of the Skiffs. Inez Skiff was last seen, wearing her gardening clothes, at 1:30 p.m. on the same day by Frieda Opdahl. When their bodies were later unearthed, Phillip Skiff was wearing a blue jumpsuit and Inez Skiff was wearing her gardening clothes.

During the day of March 19, 1983, Jeffries was seen several times by the Opdahls on the Skiffs' tractor in a field near the Skiff residence close to where the body of Phillip Skiff was found. He had never been observed by the Opdahls operating the tractor prior to that day.

Sometime later that day, Frieda Opdahl went to the Skiff residence with her grandchildren and some other children so that they could play on the Skiffs' trampoline. At this time Jeffries gave Frieda conflicting accounts as to the whereabouts of Phillip Skiff. First Jeffries said that she might find him down by the creek on the Skiff property. When Frieda and the children began to go down to the creek, Jeffries said that Phillip was getting more cedar from the field south of the Skiff residence. Frieda and the children went down to the creek, but did not meet Phillip Skiff. When they returned to the Skiff residence, Jeffries told Frieda that the Skiffs were going away for a couple of days with some friends and after that they would be leaving on a more extended trip.

Petitioner also showed Frieda, her daughter, and her grandchildren some of his carvings in the woodshop.

In the early afternoon of March 19, 1983, a Rex Elliot went to the field south of the Skiff residence to dump some brush. Elliot saw Jeffries on the tractor. Jeffries helped Elliot unload two loads of brush. Jeffries identified himself as the Skiffs' son and stated that the Skiffs were thinking of moving. Jeffries invited Elliot and his wife into the house. Jeffries stated that "they were liquidating some property" and discussed the possible sale of a television set.

Rex Elliot noticed a .22 caliber Colt Woodsman on the kitchen counter which Jeffries said he had been cleaning. Elliot did not smell any cleaning solvent. Elliot also noticed an empty shell cartridge lying on the floor.

When asked when the Skiffs would be returning, Jeffries replied that they would be back in a few minutes and asked if the Elliots wanted to wait. The Elliots declined to stay and departed.

On Monday, March 21, at 9 a.m., Jeffries told Alfred Opdahl that the Skiffs had called and told him they were in Seattle, would be returning in a few days, and then leaving again.

Later that day, Jeffries attempted to sell 2.5 ounces of placer gold and two gold coins to a gold dealer in Port Angeles. The dealer was willing to buy but, when Jeffries was unable to produce any identification, refused to consummate the transaction. At approximately 5 p.m. on that same day, Frieda Opdahl telephoned the Skiff residence. A man whose voice she did not recognize answered the phone.

During the period from March 19 to March 22, 1983, Jeffries was seen at several locations (pool hall, tavern, restaurant, bar, etc.) in Port Angeles. He was observed as having several hundred dollars in American and Canadian currency. Ten days before her death, Inez Skiff withdrew over $30,000 in Canadian currency from a British Columbia Bank. This money has never been found.

On Tuesday, March 22, defendant went to the Opdahls' house and asked directions to Bellingham, stating that he intended to meet someone there. This was the last time petitioner was seen by the Opdahls.

Jeffries left the Skiff residence on March 22 or 23, taking with him the Skiffs' pickup truck, portable television, chain saw, food, liquor, placer gold, coins, and other small articles. He traveled to Wenatchee where he sold some of the gold and coins. While in Wenatchee Jeffries became friends with Dan Helland and the two traveled together

for several days. During this period, Jeffries met briefly with his niece and her husband who had traveled down from Canada.

Eventually, Jeffries and Helland decided to prospect for gold in Canada. The two drove up to the Canadian border, abandoned the pickup truck, and hiked into Canada. Along the way, they stashed some of the food, gear, and rifles in several different locations. Much of this gear was subsequently identified as having belonged to the Skiffs. Helland later testified that Jeffries had told him that he had also stashed some .22 caliber handguns, although these were never recovered.

Once in Canada, Jeffries called his niece and learned that the Canadian police were searching for him. Jeffries' niece was later found to have several rings and figurines identified as having belonged to, or been made by, Phillip Skiff.

Jeffries returned to Wenatchee where he was subsequently arrested on April 7, 1983. He initially identified himself as James Reed, but gave his true name to police the next day.

The bodies of Phillip and Inez Skiff were recovered from two shallow graves on the Skiff property on April 1 and 2, 1983. The apparent locale of the victims' deaths was the Skiffs' jewelry and wood shop. Blood splatters, two spent bullet casings, an apparent bullet hole in a door, and Phillip Skiff's glasses were found there.

Autopsies revealed that both victims had died of multiple .22 gunshot wounds to the front and back. Autopsies were conducted on April 4, 1983. The forensic pathologist concluded that it was impossible to state precisely when the deaths occurred. He stated that normally bodies in this condition, in a relatively warm environment would have been killed seven to ten days prior to the autopsy (March 25, 1991), but that this period of time would be greater if the bodies had been buried, as they were in this case.

## JURISDICTION & VENUE

Petitioner Jeffries is in custody pursuant to the judgment of a state court and seeks relief on the ground that his imprisonment and sentence are in violation of his constitutional rights. This United States District Court therefore has jurisdiction over this petition for habeas corpus relief pursuant to 28 U.S.C. §§ 2254 and 1331.

Petitioner Jeffries was convicted in the Superior Court of Washington in and for Clallam County. Venue is therefore proper in the United States District Court for the Western District of Washington pursuant to 28 U.S.C. § 2241(d).

## LEGAL STANDARDS

■ This is a motion for summary judgment and is therefore governed by the traditional standard for summary judgment under Fed.R.Civ.P. 56. Summary judgment is appropriate if, after viewing the evidence in a light most favorable to the non-moving party, there are no issues of genuine material fact and the moving party is entitled to judgment as a matter of law.

■ This is also a federal habeas corpus proceeding and there is a presumption that the state trial and appellate court findings of fact are correct. 28 U.S.C. § 2254(d). Pursuant to statute, the presumption of effectiveness does not apply if it is established or admitted:

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the fact finding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

. . . . .

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding;

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless ... the federal court on a consideration of [the pertinent part of the State court record] ... concludes

that such factual determination is not fairly supported by the record.... 28 U.S.C. § 2254(d). The Court will note those instances in which the presumption of correctness does not apply as necessary, below.

## DISCUSSION

The amended petition for the writ of habeas corpus contains eighteen claims for relief. Eight claims, numbered 6.1 through 6.8, relate to the guilt phase of the trial. Ten claims, numbered 7.1 through 7.10, relate to the penalty phase of the trial. Each of these claims is considered below.

### A. *Claim 6.1: Failure to Change Venue/Jury Misconduct*

Petitioner alleges that the failure of the trial judge to change venue, continue the trial, sequester the jury, or to take other prophylactic steps to protect the defendant from the effects of pretrial and trial publicity rendered the trial fundamentally unfair.

Claim 6.1 contains two distinct allegations. First is a general allegation concerning prejudicial trial and pretrial publicity (¶ 6.1.1 to .6). Second is a specific allegation that one or more jurors improperly introduced extrinsic information concerning Jeffries' criminal background into the jury deliberations (¶ 6.1.7 to .12).

The Washington Supreme Court considered the more general allegation on direct appeal. *Jeffries I,* 105 Wash.2d 398, 409–10, 717 P.2d 722 (1986). The more specific allegation was not raised by Jeffries on direct appeal. The issue was raised in Jeffries' third personal restraint petition, but was not considered on the merits by Washington Supreme Court on the grounds that it was an improper "renewed" claim for relief. *Jeffries IV,* 114 Wash.2d 485, 488–491, 497–98, 789 P.2d 731 (1990).

#### 1. Trial and pretrial publicity.
##### (a) *Background.*

Respondent admits that this case received extensive media coverage in the weeks after the murders of the Skiffs. A detailed recitation of the media coverage can be found in the state court record. *See* 12 REC 3758–3949. A summary of this coverage is provided below.

Primary coverage occurred in the *Port Angeles Daily News,* a Clallam County newspaper with an average daily paid circulation of 13,001 and a Sunday circulation of 13,791. Clallam County has a population of 50,000 (of which approximately 36,250 individuals are over 18 years of age and, assuming they are registered voters, eligible for jury duty) consisting of approximately 16,400 households.

The bodies of Philip and Inez Skiff were discovered on April 2, 1983. The *Port Angeles Daily News* published stories relating to the murders on April 4, 5, 6, 8, 10, 13, 15, 17, 19, May 1, 8, and 11, 1983. Jury voir dire commenced on October 3, 1983 and the trial itself began on October 19, 1983.

The news articles, many of which were on the front page of the *Daily News,* included the following information about the crime and petitioner Jeffries: (1) Jeffries' Canadian conviction for armed robbery, his prison term in Canada, and the fact that he was on parole and being sought by Canadian authorities for possible parole violations; (2) the Clallam County Sheriff's statement that Jeffries was "armed and dangerous" and that the murders had been premeditated; (3) the fact that the Skiffs had died of multiple gunshot wounds and that their bodies were "gunshot-riddled"; (4) a description and diagram of the crime scene; (5) the statements of the Opdahls, who testified extensively at trial and were the last witnesses to see the Skiffs alive; (6) the fact that firearms were missing from the Skiff residence; and finally, (7) details of Jeffries' arrest. Several of the articles also included a photograph of Jeffries.

The *Seattle Post–Intelligencer* reported the murders on Monday, April 4, 1983, Section A, page 1. The *Seattle Times* reported the case on Tuesday, April 5, 1983, Section B, page 1. The combined daily circulation of these two papers in Clallam County is 3,988.

Television and radio coverage was also fairly extensive. There are 16,400 tele-

vision households in Clallam County, with Seattle television stations dominating the market. KOMO Television reported the story on April 4, 5, 7, 8, 9, 10, 11, and 15, 1983. KING Television broadcast the story on April 4, 5, and 15, 1983. Other broadcasts also occurred. The content of the broadcasts was similar to the coverage contained in the *Port Angeles Daily News*, including Jeffries' prison record, his parole status, and the Sheriff's statement that there was probable cause to arrest Jeffries. A photograph of Jeffries was also broadcast.

On May 9, 1983, the defense moved for a change of venue and, at oral argument, suggested that a jury be selected in another county and brought to Clallam County for the trial. These motions were denied by the trial judge. 1 REC 179. When the case became a "death case," the defense requested that the court reconsider its decision not to change venue. The motion for reconsideration was denied. 1 REC 264–65. The motion for a change of venue was renewed, and again denied, after a letter threatening Jeffries with death was received by the Prosecuting Attorney's office. 2 REC 531. The defense moved to close the courtroom and to seal pretrial pleadings. This motion was denied. 1 REC 183–84.

Jury selection commenced on October 3, 1983 and concluded on October 18, 1983. One hundred and eighty venire persons were available as jurors. Six members of the venire were excused for cause on the grounds that they believed the defendant was guilty based upon what they had read or seen in the media. 5 REC 1446–50, 1506, 1552–54, 1557–58; 6 REC 1908–10; 7 REC 1960. Three venire members were excused because they read about the case after being instructed not to by the trial judge. 5 REC 1392; 7 REC 2023, 2029. The defendant exercised four peremptory challenges against venire members who had information derived from the media concerning the case. 3 REC 891; 4 REC 985; 5 REC 1537; 6 REC 1613–14, 1626–27.

Of the 12 venire members eventually chosen for the jury, 11 had been exposed to media coverage of the murders. Each of these individuals stated that he or she had not formed an opinion as to Jeffries' guilt. Each juror also stated that he or she could set aside whatever information he or she had received and judge the case on the evidence presented. None of these 11 jurors was challenged for cause by the defense. In addition, the defense did not exercise any of 8 available peremptory challenges to excuse these individuals.

(b) *Analysis.*

 As a federal court sitting in habeas corpus, this Court must conduct an independent review of the record to determine whether the media coverage so prejudiced the petitioner that a fair trial was impossible. This review must include an examination of the exhibits containing news reports about the case for volume, content, and timing to determine whether they were prejudicial. Determinations of juror bias are factual determinations to which the presumption of correctness under 28 U.S.C. § 2254(d) applies, although the constitutional standard of jury impartiality is a question of law. *See Harris v. Pulley*, 885 F.2d 1354, 1360–61 (9th Cir. 1988) (and cases cited therein).

 Due process requires a change of venue when the trial court is unable to seat a panel of impartial and indifferent jurors because of prejudicial pretrial publicity or an inflamed community atmosphere. *Id.* at 1361; *Rideau v. Louisiana*, 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963). The prejudicial effect of pretrial publicity is tested under: (1) a presumed prejudice standard and (2) an actual prejudice standard.

 1. *Presumed Prejudice*: Prejudice is presumed (*i.e.*, it is not necessary to determine if actual prejudice is present) when the record demonstrates that the community where the trial was held was "saturated with prejudicial and inflammatory media publicity." *Rideau*, 373 U.S. at 726–27, 83 S.Ct. at 1419. Presumed prejudice is rare and reserved for those extreme situations in which the pretrial publicity has rendered the subsequent trial a "hollow formality."

A review of the exhibits contained in the state court record detailing the nature and extent of the pretrial publicity convinces the Court that this is not a case in which prejudice should be presumed. The Court agrees with the trial judge's characterization of the media coverage as essentially factual in nature. Simply put, while the media coverage clearly identified Jeffries as a prime suspect (which was certainly correct), the Court does not consider the coverage to have been unduly inflammatory or prejudicial.

In addition, the bulk of the media coverage was limited to a two-month period immediately following the discovery of the bodies. The selection of a jury did not begin until six months later. The delay between media coverage and jury selection substantially limits the prejudicial effect of the media coverage.

The Court therefore declines to find "presumed prejudice" from the jurors' pretrial media exposure.

2. *Actual Prejudice* : Next, the Court must determine whether the jurors demonstrated actual partiality or hostility that could not be laid aside. *Harris,* 885 F.2d at 1363; *Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975). Actual prejudice does not mean that the jurors must be totally ignorant of the facts and issues involved, but rather that they must be unable to set aside their opinions and impressions and render a verdict on the evidence presented. *Harris,* 885 F.2d at 1363.

The Supreme Court has stated that a good indicator for determining the reliability of juror assurances of impartiality is the number of venire members who will admit to a disqualifying prejudice. The greater the number of venire members who admit to prejudice, the more doubtful are the voir dire responses of the remaining jurors. *Murphy,* 421 U.S. at 803, 95 S.Ct. at 2037.

It is thus irrelevant in the present case that 11 of the 12 jurors had some prior knowledge of the case. All of those jurors stated under oath that they could set their previous knowledge aside and impartially judge the guilt or innocence of the defendant. The validity of the jurors' assurance of impartiality is confirmed by the fact that of the 180 members of the venire, only six were excused because, based upon what they had seen or read in the media, they believed the defendant to be guilty. Three more venire members were excused after reading about the case after having been instructed by the trial judge not to do so.

As the Supreme Court noted in *Murphy,* it is not unusual in a highly publicized case to excuse 20 individuals from a pool of 78 because they had formed an opinion of the defendant's guilt. *Id.* Clearly, the very limited number of jurors excused in the present case (6 out of 180) on this ground demonstrates that the actual prejudice caused by media exposure was virtually nonexistent.

In addition, the Court notes that the voir dire of all the jurors was extensive and thorough. The state record of the jury voir dire is contained in almost five volumes of material. Petitioner has not specified any specific portion of this record as suspect. The Court has reviewed this portion of the record and concludes that the defendant had a more than adequate opportunity to uncover any potential or actual prejudice. Moreover, in light of the defendant's eight unused peremptory challenges, the defendant could easily have stricken any venire member whose impartiality was suspect.

The Court declines to find actual prejudice resulting from the pretrial media coverage in this action.

2. Extrinsic evidence re: Jeffries' criminal history.

(a) *Background.*

Petitioner has alleged that the media coverage outlined above resulted in two specific instances of jury misconduct during the trial. Both involve references to Jeffries' criminal history. The trial court had previously granted defense motions in limine excluding any reference to Jeffries' criminal or parole record.

First, during the guilt phase, there is an allegation that one of the jurors stated: "[T]he guy's a convicted robber anyway ... oh, we're not supposed to know that are we?" Second, there is an allegation that during the penalty phase of the trial there "was some discussion of Mr. Jeffries' character in light of his possible record."

The background of the first instance of alleged juror misconduct follows. Two years after the trial, juror Thomas Tyszko alleged in an affidavit that, while returning to the jury room, another juror stated to the entire jury that "Jeffries is a convicted armed robber." In a subsequent affidavit, Tyszko stated that juror followed up this remark with a smirk and stated "Oh, we're not supposed to know that, are we?" This remark was allegedly followed by silence. In a third affidavit, Tyszko identified juror Erin Thomas as the source of the remark. Tyszko stated that he was unsure if anyone else had heard the remark except perhaps Kathleen Sims, that he personally ignored the comment, and that the issue was never raised again during the deliberations.

Kathleen Sims recalls that a statement along the lines suggested by Tyszko may have been made. She does not believe that it was heard by many of the jurors. Sims testified at the evidentiary hearing that the remark, if it was made, was given very little attention by any of the jurors. Sims stated that someone, perhaps even Sims herself, may have responded that Jeffries' criminal record was irrelevant and that it should not be discussed.

The testimony of juror Michael Stamon essentially mirrors that of juror Sims. Stamen was even less sure that such a comment had been made.

None of the remaining jurors recalls a comment concerning Jeffries' record being made in this context. Erin Thomas specifically denies making the statement attributed to him by Tyszko and denies any prior knowledge of Jeffries' criminal record. The jury foreman states that, had he heard such a statement, he would definitely have reported it to the trial judge.

After considering the affidavits contained in the state record and the testimony offered at the evidentiary hearing, the Court concludes that this reference to Jeffries' criminal background, if it was made at all, occurred only once, was almost certainly heard by only a few jurors, and did not play a role of any significance in the course of the guilt phase deliberations.

The second incident of juror misconduct is even more sparse. Juror Sims has testified that during the penalty phase of the trial one juror stated: "Didn't Jeffries have a record?" Sims states that the jury concluded this question to be irrelevant and it was not considered during the remainder of their deliberations.

(b) *Analysis.*

While the introduction of extrinsic evidence raises a constitutional issue as to whether the defendant was tried by an impartial jury, "due process does not require a new trial every time a juror has been placed in a compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982). In cases involving the introduction of extrinsic evidence into jury deliberations, "the proper standard to be applied is whether it can be concluded beyond a reasonable doubt that extrinsic evidence did not contribute to the verdict." *Gibson v. Clanon*, 633 F.2d 851, 855 (9th Cir.1980).

The Ninth Circuit has outlined five factors to be considered when assessing such claims of jury misconduct:

(1) whether the extrinsic material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether the extrinsic material was introduced before the verdict was reached, and if so, at what point in the deliberations was it introduced; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the introduction of extrinsic material affected the verdict.

*Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir.1986) (citations omitted). After considering these factors in light of the state court record and the evidence offered

at the evidentiary hearing, the Court concludes that there was no reasonable possibility that the extrinsic evidence contributed to the verdict either in the guilt or death penalty phase.

■ In applying the *Bayramoglu* factors to the alleged remark made during the guilt phase as the jury was returning to the jury room, the Court concludes as follows. First, even assuming that the remark was made, it was heard only by three jurors at most. The rest of the jury did not "receive" this information. Second, the evidence clearly indicates that the remark was made only in passing and was not repeated. Third, the remark was neither considered nor dwelled upon by the jury. Fourth, the remark was introduced prior to a verdict being reached. The record is unclear, but it was apparently not introduced during deliberations, but rather in the course of the trial itself. Fifth, and perhaps most importantly, is the fact that even those jurors who actually heard the remark have repeatedly stated that it was not a factor in reaching their decision.

■ The *Bayramoglu* factors apply in virtually the same manner to the comment allegedly made during the penalty phase. Briefly, the comment was only recalled by a few individuals and each of those individuals agrees that the comment was brief and was not a factor in his or her decision to impose the death penalty.

Under these circumstances, the Court concludes that there is no reasonable possibility that the introduction of extrinsic evidence affected the jury verdict in this action.

For the reasons outlined above, the Court declines to grant petitioner Jeffries' claim for relief number 6.1.

### B. *Claim 6.2: Insufficient Evidence*

Jeffries alleges that there was insufficient evidence presented at trial to support a finding of aggravating circumstances beyond a reasonable doubt.

2. A third aggravating circumstance was dis-

#### 1. Background.

The factual background of the crimes with which petitioner Jeffries was charged has been outlined in the preliminary section of this order and are incorporated here by reference.

In Washington, an individual is guilty of aggravated first degree murder if he is found to have committed murder in the first degree as defined in RCW 9A.32.-030(1)(a) ("premeditated intent to cause the death of another person, he causes the death of such person or of a third person") and one or more of the aggravating circumstances outlined in RCW 10.95.020 are found to exist.

Jeffries was charged with the following two aggravating circumstances on each of the two counts of murder: (1) that the defendant committed the murder to conceal the commission of a crime or to protect or conceal the identity of any person committing a crime, and (2) that there was more than one victim and that the murders were part of a common scheme or plan or the result of a single act of the defendant.[2] The jury returned a special verdict finding both aggravated circumstances present on both counts. RCW 10.95.020(7) and (8). 15 REC 4806, 4808, 4810–11.

Jeffries contends that insufficient evidence existed to tell what underlying crime has been committed, what victim was murdered first, and whether the murders were part of a common scheme or plan.

The Washington Supreme Court reviewed the record and concluded that there was "substantial evidence to support the jury's findings and verdict that defendant killed the victims in order to steal their property and to prevent his identification as their killer." *Jeffries I*, 105 Wash.2d 398, 407, 717 P.2d 722 (1986).

#### 2. Analysis.

In a criminal action the burden is on the prosecution to prove every fact necessary to constitute the charged crime beyond a reasonable doubt. *In re Winship*, 397 U.S.

missed prior to trial.

358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970).

■ A challenge to a state criminal conviction under 28 U.S.C. § 2254 based on a claim of insufficient evidence, however, shall be granted only if it is found upon "viewing the evidence in a light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979).[3] Another way of stating this standard is that habeas relief on this claim is only appropriate if no rational trier of fact could have found proof of guilt beyond a reasonable doubt. *Id.* at 320–24, 99 S.Ct. at 2789–92.

Applying this standard, the Court concludes that the jury could rationally have found the presence of either of the two aggravating circumstances.

To begin with, petitioner raises a variety of questions designed to attack the sufficiency of the evidence. Petitioner, for example, questions why, if he was intending to steal the Skiffs' property, did he not commit the crime when the Skiffs were in California, why did he leave behind three television sets and a VCR, why did he not remove the jewelry from the body of Inez Skiff, and why did he remain at the residence for four days following the murders?

■ Questions of this kind, however, can always be asked when the evidence against the defendant is circumstantial. Because there is no evidence suggesting that Jeffries discussed his motives or plan with anyone prior to committing the crime, and because no one actually witnessed the crimes, it is impossible to say precisely why Jeffries elected to take one course of action as opposed to another. Nor is such a precise recounting of Jeffries' motives or reconciliation of his actions required of this Court. The only issue is whether a jury could have rationally reached its decision based upon the evidence presented to it.

The Court begins with the uncontested fact that Jeffries was in possession of the Skiffs' property—including a truck, chain saw, guns, gold, television set and a variety of other articles—shortly after the Skiffs were murdered. There is, of course, a variety of possible scenarios as to Jeffries' involvement in the murder that may be posited from this bare fact.

■ One obvious possibility is that Jeffries conceived of a plan for murdering the Skiffs so that he might steal their property with less chance of detection. This, the Court believes, is a rational interpretation of the events that were presented to the jury. By itself, this information is sufficient grounds for finding that a rational jury could have concluded that the aggravating circumstances were present.

When the additional circumstances surrounding the murders are considered, this rational possibility becomes a reasonable probability. These additional factors include: Jeffries' attempt to sell the Skiffs' television to the Elliots shortly after the Skiffs' deaths; Jeffries' presence at a Port Angeles bar with a large amount of Canadian currency on the evening that the murders were probably committed; Jeffries' attempt to sell gold belonging to the Skiffs two days after their deaths; and Jeffries' various attempts to confuse individuals as to the location of the Skiffs and when they would return. With this evidence before it, it is possible—even, the Court believes, likely—that a rational jury would find the presence of aggravating circumstances.

Claim 6.2 will be denied.

### C. *Claim 6.3: Failure to Define Aggravating Circumstances*

Jeffries contends that the trial court's failure to define the essential elements of the "aggravated circumstances" in this death penalty case constitutes constitutional error.

---

**3.** This standard is identical to that employed by the Washington State Supreme Court when considering this issue. *Jeffries I,* 105 Wash.2d 398,

407, 717 P.2d 722 (1986); *State v. Green,* 94 Wash.2d 216, 616 P.2d 628 (1980).

1. Background.

Jeffries was charged with premeditated first degree murder. In Washington, if the existence of certain aggravating circumstances is proven, premeditated first degree murder can lead to a sentence of death. Before a sentence of death may be imposed, the prosecutor must first seek the death sentence, the state must prove the presence of certain aggravating circumstances, and then the jury must find that there are not sufficient mitigating circumstances to merit leniency. RCW 10.95.020 *et seq.* Jeffries challenges the sufficiency of the jury instructions and verdict form as they relate to the aggravating circumstances issue.

At the guilt phase of the trial, the jury returned the following special verdict as to both counts.

We, the jury, return a special verdict . . . by answering as follows:

The defendant committed the murder to conceal the commission of a crime or to protect or conceal the identity of any person committing a crime.

Answer: <u>Yes</u>
 (Yes or No)

There was more than one victim and the murders were part of a common scheme or plan or the result of a single act of the defendant.

Answer: <u>Yes</u>
 (Yes or No)

15 REC 4810–11.

Petitioner contends that the trial judge's instructions and verdict form are flawed because they failed to specify or define the following essential elements of the offense: (1) the crime Jeffries was alleged to have concealed; (2) the "common scheme or plan"; (3) the mental states corresponding to the acts alleged as aggravating circumstances; and (4) the indicia of mens rea attendant to the common scheme or plan or result of a single act.

While Jeffries does not indicate the instructions to which he objects, they appear to be Instruction No. 6 (definition of aggravated murder in the first degree), No. 7 (to convict—count I), and No. 8 (to convict—count II). 15 REC 4796–4800. Jeffries did not object to these instructions on the grounds raised in claim 6.3 at trial.[4]

■ The Washington Supreme Court considered, and denied, the instant argument on direct appeal.[5] The Washington Supreme Court specifically held that Washington's aggravated murder statute does not include a requirement that a specific crime be stated or proven, only that the defendant committed the murders to conceal his identification as the person committing *a* (general, not particular) crime. *Jeffries I*, 105 Wash.2d 398, 419–420, 717 P.2d 722 (1986).

2. Analysis.

■ In order to establish a due process violation based upon faulty jury instructions, a habeas petitioner must show the instruction by itself infected the entire trial to such an extent that the resulting conviction violates due process. *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *Van Pilon v. Reed*, 799 F.2d 1332, 1342 (9th Cir.1986). The burden on the petitioner becomes "especially heavy" when the alleged error is the failure to give an instruction, as opposed to the actual giving of an erroneous instruction. *Henderson v. Kibbe*, 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977).

■ Petitioner argues extensively that the instructions and verdict form violate the general constitutional mandate that every element of the crime be proved beyond a reasonable doubt. The principle that all elements of the crime must be proven beyond a reasonable doubt is a proposition with which the Court certainly

---

4. Jeffries did object to Instruction Nos. 6, 7 and 8 on the grounds that there was not "sufficient evidence to convince any rational trier of fact beyond a reasonable doubt of the elements of aggravation." 11 REC 3472.

5. The Supreme Court considered this argument despite the fact that Jeffries had failed to object to the instructions at trial. 105 Wash.2d at 418, 717 P.2d 722. Because the Supreme Court reached this argument, this Court will also consider the merits of petitioner's claim.

**1542**

agrees. *See In re Winship*, 397 U.S. 358, 369, 90 S.Ct. 1068, 1075, 25 L.Ed.2d 368 (1970).

■ The United States Supreme Court has made it abundantly clear, however, that the prosecution must prove beyond a reasonable doubt only those elements of the crime included in the definition of the offense. *Patterson v. New York*, 432 U.S. 197, 210–211, 97 S.Ct. 2319, 2327, 53 L.Ed.2d 281 (1977). Moreover, it is the sole responsibility of the States to define the elements of criminal offenses. *See, e.g., Martin v. Ohio*, 480 U.S. 228, 232, 107 S.Ct. 1098, 1101, 94 L.Ed.2d 267 (1987) (reiterating the "preeminent role of the States in preventing and dealing with crime and the reluctance of the Court to disturb a State's decision with respect to the definition of criminal conduct ... including the burden of producing evidence and allocating the burden of persuasion").

■ In the present case, the Washington Supreme Court has determined that under Washington law there is no requirement that the prosecution prove that a defendant charged with aggravated first degree murder intended to conceal a particular crime. *Jeffries I*, 105 Wash.2d, 398, 419–20, 717 P.2d 722 (1986). This conclusion is consistent with the Supreme Court's interpretation of Washington's similar statutes involving "intent to commit a crime" provisions. *See, e.g., State v. Bergeron*, 105 Wash.2d 1, 711 P.2d 1000 (1985).

Therefore, petitioner's belief that it is necessary for the State to specify and define which crime defendant intended to commit is clearly incorrect. Washington State has not included that as an element of the offense of premeditated first degree murder.

■ To the extent that petitioner is suggesting that the definition of aggravating circumstances is unconstitutionally vague, the argument is not well taken. The United States Supreme Court has stated that a capital sentencing scheme must provide a meaningful basis for distinguishing those case in which the death penalty is imposed from those in which it is not, must obviate standardless sentencing discretion, and must channel the sentencer's discretion by clear and objective standards. *Godfrey v. Georgia*, 446 U.S. 420, 427–28, 100 S.Ct. 1759, 1764–65, 64 L.Ed.2d 398 (1980) (and case cited therein) (finding "outrageously or wantonly vile, horrible or inhuman in that in involved torture, depravity of mind, or an aggravated battery to the victim" to be an unconstitutionally vague aggravating circumstance).

The Court does not believe that the "committing a murder to conceal a crime" or the "common scheme or plan" aggravating circumstances are unconstitutionally vague. Both are straightforward concepts that define an essentially objective standard (unlike the subjective "outrageously or wantonly vile, horrible or inhuman"). These concepts are intuitively understandable by a lay jury. They are not so malleable that meaningful appellate review is impossible. The Court declines to find error on this ground.

The Court will deny claim for relief 6.3.

**D.** *Claim 6.4: Failure to Require Unanimous Verdict, Guilt Phase*

Jeffries alleges that the jury was permitted to return a verdict that was not necessarily unanimous, violating his rights under the Sixth, Eighth, and Fourteenth Amendments. This argument is related to claim 6.3, discussed above, and to claim 7.9, discussed below.

1. Background.

The "to convict" instructions on each of the two murder counts stated:

(a) That the defendant committed the murder to conceal the commission of a crime or to protect or conceal the identity of any person committing a crime; or

(b) There was more than one victim and the murders were part of a common scheme or plan or the result of a single act of the defendant.

15 REC 4798, 4799; RCW 10.95.020(7) and (8). Petitioner contends that these instructions permitted the jury to return a verdict where not all the jurors necessarily agreed on the existence of a single aggravating

circumstance. That is, some jurors could have found that the common plan was to commit murder, while others could have found that the common plan was to commit theft, etc. Petitioner argues that these multiple possibilities impermissibly precluded the jury from reaching a unanimous verdict.

Instruction No. 12 stated in part:

If you find the defendant guilty on verdict form A, do not use verdict form B. If you find the defendant not guilty or are unable to reach a unanimous decision on verdict form A, use verdict form B and enter the words "guilty" or "not guilty" according to the decision you reach.

15 REC 4804. Petitioner did not object to either of these instructions at trial.

2. Analysis.

 Normally, a general instruction on the requirement of unanimity suffices to instruct the jury that they must be unanimous on whatever specifications form the basis of the guilty verdict. *United States v. Payseno*, 782 F.2d 832, 835 (9th Cir. 1986). The exception is when "there is a genuine possibility of jury confusion or that conviction may result from different jurors concluding that the defendant committed different acts." *United States v. Echeverry*, 719 F.2d 974, 975 (9th Cir.1983).

 The Court is not convinced that such confusion is present here. First, as discussed in the previous section, there was no need for the jury to determine whether a specific crime occurred in order to find the presence of an aggravating circumstance pursuant to RCW 10.95.020(7). The jury need only be unanimous in its decision that the murder was committed to conceal the commission of some (nonparticular) crime. It is therefore irrelevant whether the jury unanimously concluded that the murder was committed to conceal the crime of theft or to conceal the murder of one of the Skiffs, all that the jury had to agree upon was that the murder was committed to conceal a crime. There is little possibility of jury confusion in this regard.

 Second, the phrase "common scheme or plan" contained in RCW 10.95.-020(8) is, the Court believes, self-explanatory and unlikely to lead to jury confusion. As long as the jury was unanimous in its belief that the murders were committed as part of such a common scheme—which the verdict form indicates that they did—then the requirements of the statute are satisfied.

The Court concludes that the general unanimity instruction offered by the trial judge was sufficient to protect the defendant's right to a unanimous verdict.

E. *Claim 6.5: Newly Discovered Evidence*

Jeffries argues that the failure of the trial court to grant a motion for a new trial based on newly discovered evidence denied his Fifth, Eighth, and Fourteenth Amendment rights.

1. Background.

The newly discovered evidence comes from Josephine Green, the former manager of Fairchild Travel Service in Sequim, Washington. 15 REC 4908.

Green testifies that on March 19, 1991 at approximately 10:30 a.m. a Buick automobile covered with mud, and with California license plates, drove up to her office. Green was so frightened by the three "very sinister looking men" in the car that she called her manager and said that she was about to be robbed. Green's manager told her to leave the phone off the hook, but Green was "so shaken" that she hung up.

One of the men—who was about 38 years old, had a beard, a ragged cloth jacket, and was unkempt—entered the business. He told Green that he was looking for a place on the Barr Road extension and showed her a telephone number. The Barr Road extension leads into the Barr Road, where the Skiff residence was located. When Green offered to place the call the man, who was adamant about her not calling, grabbed the telephone number and left. The car drove away in a screech and stopped at a nearby gas station.

Phillip Skiff was last seen on the morning of March 19, 1991. Inez Skiff was last seen at approximately 1:30 p.m. on the same date. Green's encounter with the men in the Buick thus occurred approximately three hours before the last sighting of Inez Skiff. The travel service managed by Green is located about five miles from the Barr Road where the Skiffs lived.

Petitioner urges that this newly discovered evidence be considered in the context of the evidence which was introduced at trial, in particular, the testimony that Phillip Skiff grew, smoked, and sold marijuana.

One friend of the Skiffs stated that there was several hundred thousand dollars' worth of marijuana stashed in the residence on January 1, 1983. The Skiffs traveled to California in late January, 1983. Only a small amount of marijuana, several marijuana smoking devices, and 12 marijuana stalks were recovered during the search of the Skiff residence on April 2, 1983. 8 REC 2624, 2628; 9 REC 2710, 2733–34, 2904; 10 REC 3277, 3417–19, 3439; and 12 REC 3460–61. Petitioner was not in possession of any marijuana when he was arrested nor was any marijuana discovered in his secret storage caches.

On the basis of Green's newly discovered testimony, Jeffries moved for a new trial. The trial judge declined to grant this motion. The Washington Supreme Court did not consider this issue on the merits, ruling that Jeffries had "abused the writ" by not raising the issue in a previous petition. By Order dated April 15, 1991, this Court ruled that consideration of this issue was not precluded by the "procedural bar" doctrine.

The Court ordered an evidentiary hearing on this claim. The only testimony offered by petitioner on this claim was that of Josephine Green. Unfortunately, due to illness, Green's doctor recommended that she not travel to Seattle to testify at the evidentiary hearing. The Court's consideration of this issue is therefore limited to a second affidavit submitted by Green. This affidavit substantially mirrors the affidavit filed with the state trial court.

2. Analysis.

■ By itself, the existence of newly discovered evidence relating to guilt is not sufficient grounds for habeas corpus relief. *Townsend v. Sain,* 372 U.S. 293, 317, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963).[6] Instead, it must be shown that the newly discovered evidence would probably have resulted in the defendant's acquittal. *Quigg v. Crist,* 616 F.2d 1107, 1112 (9th Cir.), *cert. denied,* 449 U.S. 922, 101 S.Ct. 323, 66 L.Ed.2d 150 (1980); *Gordon v. Duran,* 895 F.2d 610, 614–15 (9th Cir.1990).

■ While the testimony of Josephine Green is superficially compelling, the Court does not believe that the evidence she presents, had it been available to the jury, "would probably have resulted in acquittal." Green's testimony does nothing to contradict the strong circumstantial evidence linking Jeffries to the murders. This circumstantial evidence, which has already been discussed in claim 6.2, includes: Jeffries' presence at the crime scene, his presence near the Skiffs' graves, his inconsistent statements to Mrs. Opdahl as to the location of the Skiffs; and his possession of the Skiffs' property in the days following murder.

Jeffries' interpretation of the Green testimony is that the Skiffs were murdered as the result of a drug deal that went bad. It is important to remember that the jury had before it substantial testimony concerning Phillip Skiff's involvement in growing and possibly selling marijuana. The jury apparently gave this evidence little credence either in terms of minimizing the aggravating circumstances or as a possible mitigating factor. The Court does not believe that Green's testimony, by itself, would be likely to change a juror's opinion in this regard.

Strong circumstantial evidence of this nature has been held by the Ninth Circuit to

---

**6.** *Townsend* established the rule that a federal district court must conduct an evidentiary hearing whenever "evidence crucial to the adequate consideration of the constitutional claim was not developed at the state court hearing ..." 372 U.S. at 317, 83 S.Ct. at 759. As noted above, petitioner has been granted the opportunity to present evidence on this claim.

be sufficient grounds to deny a motion for a new trial on the grounds that there has been newly discovered evidence—evidence which only suggests that some other individual *might* have committed the crime, not that the defendant did not commit the crime. *Quigg,* 616 F.2d at 1112.

While the issue is a close one, the Court does not believe that the trial judge's decision not to grant a new trial based on the newly discovered evidence was an error of constitutional magnitude. The Court will deny petitioner's claim for relief number 6.5.

### F. *Claim 6.6: Prejudicial Testimony—Petitioner in Jail*

In claim 6.6, Jeffries alleges that the testimony of a prosecution witness referring to Jeffries' having been in jail violated his Sixth, Eighth, and Fourteenth Amendment rights.

#### 1. Background.

John Kennedy, a friend of the Skiffs, was a prosecution witness. On direct examination he was asked by the prosecutor when it was that he had first heard of Mr. Jeffries. Kennedy replied: "[I]t was when I met Phil and Inez in Chilliwack that he used to do carving and things like that when he was in jail somewhere in Canada." 8 REC 2635.

Defense counsel objected and, out of the presence of the jury, moved for a mistrial. The trial judge denied the motion and found that Kennedy's response had been inadvertent and not intentionally elicited by the prosecutor. The Court directed the jury to disregard the prosecutor's question and Kennedy's response. 8 REC 2637–38.

#### 2. Analysis.

 Habeas relief is available for error in the interpretation or application of state evidentiary rules only when the admission of the questioned evidence renders the trial so fundamentally unfair as to violate federal due process. *Butcher v. Marquex,* 758 F.2d 373, 378 (9th Cir.1985); *McGuire v. Estelle,* 873 F.2d 1323, 1325 (9th Cir.1989).

 In the present action, Jeffries has not met his burden of establishing that the evidence in question rendered the trial fundamentally unfair. There is no indication on the record that the question or response were intended to elicit information concerning Jeffries' criminal history. To the contrary, the trial judge specifically found that statement to be inadvertent. The trial judge's remedial instruction to the jury offset any possible prejudice caused by this incident. The trial judge's decision to deny defendant's motion for a mistrial does not rise to the level of constitutional error.

### G. *Claim 6.7: Weapons Unrelated to Charged Offense*

In claim 6.7 Jeffries alleges that the admission of evidence that, subsequent to the killings, he was in possession of three guns and ammunition "unconnected" with the charged crimes violated his Sixth, Eighth, and Fourteenth Amendment rights.

#### 1. Background.

Four or five days after the Skiffs were last seen, Jeffries met Dan Helland in Wenatchee and the two traveled together for several days. Jeffries had a .22 semi-automatic rifle and Helland had a 30.06 lever action rifle. Both weapons were subsequently hidden, cleaned and broken down. Helland later testified that Jeffries had told him that he had .22 caliber handguns "stashed." 8 REC 2451–2478; 8 REC 2553–54. The two rifles and some .22 caliber bullets were recovered from three different "stashes" near the Canadian border.

A .22 caliber rifle, a .22 caliber Regent revolver, a .22 caliber Ruger semi-automatic pistol, and some .22 bullets were missing from the Skiff residence after the killings.

The rifles, bullets, and Helland's statement about the handguns were admitted into evidence. Petitioner contends that the introduction of such evidence is prohibited by Washington Rule of Evidence 404(b), which states that "evidence of other crimes, wrongs, or acts is not admissible to prove character of a person or to show that he acted in conformity therewith."

On direct appeal, the Washington Supreme Court rejected this argument. The Supreme Court stated that, under Washington law, only weapons unrelated to the crime were inadmissible. *See, e.g., State v. Robinson*, 24 Wash.2d 909, 915, 167 P.2d 986 (1946). The Supreme Court found that in the present action (1) that "the .22 caliber rifle and bullets were stolen from the victims and were part of the crime," (2) that since both unaccounted for pistols could have been the murder weapon or weapons, "the jury could infer that the defendant had stolen the two missing guns and used them to murder the Skiffs," and (3) that FBI had determined that the bullets could have come from the same boxes of .22 caliber bullets recovered from Jeffries' "stash." The Supreme Court concluded that the weapons and bullets were related to the crime and that their introduction into evidence was admissible.

2. Analysis.

■ The applicable standard of review as to the propriety of the introduction of this contested evidence is the same as that outlined in the previous section. Namely, petitioner must demonstrate that the introduction of the evidence violated state rules of evidence and rendered the trial so fundamentally unfair that federal due process is violated. Again, petitioner has failed to satisfy this test.

First, as outlined above the Washington Supreme Court has clearly stated that the introduction of weapons related to the crimes does not violate Washington Rule of Evidence 404(b). There is thus no violation of a state evidence rule and no grounds for habeas relief. Moreover, this Court believes that the Washington Supreme Court's determination that the weapons and ammunition were related to the crime is fairly supported by the evidence and therefore entitled to a presumption of correctness. The Court will deny petitioner's request for relief number 6.7.

H. *Claim 6.8: Failure to Prosecute by Indictment*

Jeffries alleges that the failure to prosecute this capital case by indictment violated his rights guaranteed by the Fifth, Eighth, and Fourteenth Amendments.

1. Background.

Petitioner was charged by information filed on April 4, 1983, with two counts of murder in the first degree. He was arraigned and pleaded not guilty to both counts on April 15, 1983. On May 6, 1983, an amended information was filed alleging two counts of aggravated murder in the first degree. Petitioner was arraigned and pled not guilty to the amended information on May 25, 1983. The state did not convene a grand jury and no indictment was ever issued against the petitioner.

Indictment by grand jury is not required under Washington law. Wash.Const.Art. I, § 25; RCW 10.37.

2. Analysis.

■ In *Hurtado v. California*, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884), the United States Supreme Court first held that indictment by grand jury was not part of the due process guarantees provided state criminal defendants through the Fourteenth Amendment. This holding has been specifically applied to Washington State's practice of prosecution by information. *Gaines v. Washington*, 277 U.S. 81, 48 S.Ct. 468, 72 L.Ed. 793 (1928). The *Hurtado* holding remains valid. *Rose v. Mitchell*, 443 U.S. 545, 557, 99 S.Ct. 2993, 3000, 61 L.Ed.2d 739 (1979); *Narten v. Eyman*, 460 F.2d 184, 190 (9th Cir.1969).

Petitioner devotes a considerable portion of his memorandum in opposition arguing that *Hurtado* holding is incorrect and ripe to be overruled. Petitioner traces both the historical development of the grand jury system and the development of the "incorporation doctrine" over the last 100 years. Of necessity, petitioner's analysis stops circa 1973, for the Supreme Court has never taken the final step and held that the indictment requirement of the Fifth Amendment is binding upon the states, and it is, this Court believes, unlikely to do so now.

Given the ample precedent supporting prosecution by information, the Court de-

clines petitioner's request to establish a new constitutional rule on this issue.

### I. Claim 7.1: Mitigating Circumstances (Plural)

Jeffries contends that the penalty phase instructions and the verdict form precluded a juror from giving effect to a single mitigating circumstance, no matter how weighty, because the instructions required that there be mitigating circumstances (plural) in order to merit leniency.

#### 1. Background.

The Washington death penalty statute requires the prosecution to prove the absence of sufficient mitigating circumstances. The statute states:

> (4) Upon conclusion of the evidence and argument at the special sentencing proceeding, the jury shall retire to deliberate upon the following question: "Having in mind the crime of which the defendant has been found guilty, are you *convinced beyond a reasonable doubt* that there are not sufficient *mitigating circumstances* to merit leniency?"

RCW 10.95.060(4) (emphasis added). Respondent naturally focuses on the "beyond a reasonable doubt" language and the burden of proof imposed upon the state. Petitioner focuses on the mitigating circumstances (plural language). The issue is significant because during the special sentencing proceeding the only evidence in mitigation introduced by the defense was several examples of Jeffries' wood carvings. See claim 7.6.

The jury instructions and the verdict form both mirror the language of the statute. Instruction No. 3:

> The question you are required to answer is as follows:
> "Having in mind the crime of which the defendant has been found guilty, are you *convinced beyond a reasonable doubt* that there are not sufficient *mitigating circumstances* to merit leniency?"
> If you unanimously answer "yes" the sentence will be death. If you do not unanimously answer "yes" or if you

unanimously answer "no", the sentence will be life imprisonment without the possibility of parole.

> In deciding the question posed, you may consider any relevant factors.

15 REC 4825. The special sentencing proceeding verdict form repeated the interrogatory contained in Instruction No. 3. Instruction No. 4 stated:

> During the special sentencing proceedings, the State bears the burden of proving beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency.

> The law of this state presumes that a defendant enters the special sentencing meriting leniency, that is a sentence of life in prison without possibility of parole. This presumption continues throughout the entire proceeding unless you find it has been overcome by the evidence beyond a reasonable doubt.

> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly and carefully considering all of the evidence or lack of evidence. If, after such consideration, you have an abiding belief that there are not sufficient mitigating circumstances to merit leniency, then you are satisfied beyond a reasonable doubt.

15 REC 4826. Finally, mitigating circumstance (singular) was defined in Instruction No. 5 as follows:

> A mitigating circumstance is a fact about the offense or about the defendant, which in fairness or mercy may be considered in extenuating or reducing the degree of moral culpability and punishment, although it does not justify or excuse the defense.

15 REC 4827.

#### 2. Analysis.

 Jeffries argues that, given the repeated use of mitigating circumstances (plural) throughout the instructions, verdict form and statute, it was impossible for a juror to find that a single mitigating circumstance was sufficient to merit leniency.

Jeffries contends that this represents an unconstitutional limit on the right of the jury to consider any mitigating circumstance.

This argument would have more weight if the Ninth Circuit Court of Appeals had not recently considered a virtually identical issue. In *Campbell v. Kincheloe*, 829 F.2d 1453, 1456-66 (9th Cir.1987); *cert. denied*, 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988), a defendant, on trial in Washington, presented no mitigating evidence during the special sentencing proceeding. The jury instruction and special verdict form were essentially identical to those employed in the instant action. The Ninth Circuit rejected the argument that the statute and instructions created a mandatory presumption in favor of the death penalty.

In reaching this conclusion, the Ninth Circuit emphasized that, under Washington law, the State still bears the burden of overcoming the presumption in favor of leniency, even if no mitigating evidence is presented. Moreover, the jury is free to consider any relevant factors, including those factors that may have been raised during the *guilt* phase of the trial. Finally, the defendant is not permitted to manufacture a "presumption of death" simply because he chooses not to present mitigating evidence. *Id.* at 1466; *see also State v. Bartholomew*, 101 Wash.2d 631, 683 P.2d 1079 (1984).

This precise analysis is controlling in the present case. As the respondent points out, if the presumption in favor of leniency is retained when the defendant presents no mitigating evidence, it must also be retained when the defendant presents a single piece of mitigating evidence. To conclude otherwise would create an absurd scenario.

Jeffries' argument might make sense if the burden had been on him to present evidence relating to mitigating circumstances. If that were the case, then a juror might read the verdict form as requiring more than a single mitigating factor before leniency could be found. When the jury instructions are considered as a whole, however, it is clear that the jury was more than adequately informed that: (1) the defendant entered the special sentencing proceeding with a presumption of leniency, (2) the presumption continued throughout the proceeding unless overcome by evidence beyond a reasonable doubt, and (3) the jury was free to consider any relevant mitigating factors.

Given this clearly stated presumption in favor of leniency, petitioner's argument that the jury was compelled to impose a death sentence because only a single mitigating factor was presented is without merit.

### J. *Claim 7.2: "Having in mind the crime"*

Jeffries contends that the instruction requiring the jury to "have in mind the crime" improperly prohibited the jury from considering mitigating factors not related to the crime during the special sentencing proceeding and therefore precluded an individualized determination of the appropriateness of the death penalty.

#### 1. Background.

The relevant jury instructions are Nos. 3 and 5, both outlined in the previous section. Counsel for petitioner reviewed all state death penalty statutes to determine whether the statutory special interrogatory in regard to claim 7.2 is unique in the United States. The statutes researched reveal that no state death penalty statute in the United States mandates that the jury "have in mind the crime" when making its requisite individualized determination to sentence a human being to death.

#### 2. Analysis.

■ The Constitution requires that a sentencer not be precluded from considering as mitigating evidence any aspect of the defendant's character and record and any of the circumstances of the offense that a defendant might offer to mitigate the sentence. *See, e.g., Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *McKenzie v. Risley*, 842 F.2d 1525, 1538 (9th Cir.1988).

Jeffries contends that the "having in mind the crime" language contained in Instruction No. 3 forced the jury to consider only factors relating to the crime and precluded the jury from considering mitigating evidence relating to the defendant as an individual. Other aspects of the jury instructions, however, clearly informed the jury that their discretion was not so limited.

First, the last sentence of Instruction No. 3 states that the jury, in deciding the question posed, "may consider any relevant factors." Jeffries argues that this instruction should have read "any mitigating factors." Given that the instruction directs the jury to determine whether mitigating circumstances are present, a reasonable juror could only conclude that "any relevant factors" included mitigating circumstances.

In addition, Instruction No. 5 states: "A mitigating circumstance is a fact about the offense, *or about the defendant,* . . . ." (emphasis added). This, the court believes, clearly satisfies the requirement that the jury be directed to consider as mitigating evidence any matter relating to the character or record of the defendant or the circumstances of the offense. *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

Claim 7.2 will be denied.

### K. *Claim 7.3: "Any relevant factors"*

Jeffries contends that the instruction permitting the jury to consider "any relevant factors" rather than "any mitigating factors" prevented the jury from making an individualized determination of the appropriateness of the death penalty.

#### 1. Background.

Jury Instruction No. 3 concluded by stating: "In deciding the question posed you may consider any relevant factors." This instruction is quoted in full in the discussion of claim 7.1, above.

#### 2. Analysis.

Jeffries contends that the trial court erred by permitting the jury to consider any relevant factors, as opposed to "any relevant mitigating factors," and by failing to define "relevant factors". The Court disagrees.

First, the Court does not agree with Jeffries' assumption that, in a capital case, the sentencing authority must consider evidence of the defendant's character, record, and circumstances of the crime only as "mitigating" evidence. The Constitution permits the jury to consider non-statutory aggravating factors in reaching its sentencing decision. *Barclay v. Florida,* 463 U.S. 939, 956–58, 103 S.Ct. 3418, 3428–29, 77 L.Ed.2d 1134 (1983); *McKenzie v. Risley,* 842 F.2d 1525, 1541 n. 33 (9th Cir.1988). The Washington Supreme Court has also held that the Washington Constitution permits the limited introduction of aggravating evidence at the sentencing hearing. *State v. Bartholomew,* 101 Wash.2d 631, 642–43, 683 P.2d 1079 (1984). Thus, contrary to Jeffries' assertions, it would have been improper to instruct the jury that only mitigating factors could be considered.

Second, it is of course improper to preclude the jury from considering any mitigating evidence that the defendant wished to introduce. *McCleskey v. Kemp,* 481 U.S. 279, 306, 107 S.Ct. 1756, 1774, 95 L.Ed.2d 262 (1987). Nothing in the instructions presented to the jury, however, limited the defense in this regard.

Moreover, it is likely that any attempt to limit the definition of "relevant factors" would have been improper. *Id.* This prohibition against attempting to define "relevant factors" makes sense because it is impossible to state in advance what evidence the defendant might wish to introduce in mitigation. Even factors such as the defendant's criminal record might—in some contexts—be viewed as "mitigating evidence."

Finally, the definition of "mitigating circumstance" as presented in Instruction No. 5 permitted the jury to give mitigating effect to virtually any evidence. After con-

sidering Instructions No. 3, 4, and 5 in their entirety, the Court does not believe that the jury was precluded from considering any mitigating evidence, nor was it improperly channeled to consider only certain portions of the evidence. The Court does not believe that Instruction No. 3 prevented the jury from making an individualized sentencing determination.

Petitioner's claim 7.3 will be denied.

### L. Claim 7.4: Failure to Require Articulation of Mitigating Circumstances; Rational Review Impossible

Jeffries contends that the failure to require the jury to articulate what mitigating circumstances it found, and how they were weighed against the aggravating factors, violated his constitutional rights.

#### 1. Background.

The jury in this action was not required to, and did not, specify whether it found any mitigating circumstances to exist. The jury was not required to weigh the aggravating circumstances found during the guilt phase of the trial against the mitigating circumstances, if any, found during the penalty phase.

Under the Washington death penalty scheme, the Washington Supreme Court is required, in addition to considering the direct appeal, to review any sentence of death to determine:

(a) Whether there was sufficient evidence to justify the affirmative finding to the question posed by RCW 10.95.060(4); and

(b) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant....; and

(c) Whether the sentence was brought about through passion or prejudice.

RCW 10.95.130(2). The Supreme Court must be provided with a full record of the guilt and penalty phase of the trial, including a verbatim report of the proceedings.

#### 2. Analysis.

Claim 7.4 contains three sub-issues: (a) should the jury have been required to specify the mitigating factors it considered and how these factors weighed against the aggravating factors; (b) could the Washington Supreme Court adequately review the sentence as required by RCW 10.95.030; and (c) was the jury required to agree unanimously on the alternatives within the aggravating circumstances?

Neither party has been able to cite to the Court any definitive case law on the first issue. It appears that no federal court has required a jury to articulate the mitigating circumstances relied upon in making a sentencing decision. The case cited by petitioner, *Smith v. McCormick*, 914 F.2d 1153 (9th Cir.1990), is not controlling on this issue as it involved findings made by a trial judge pursuant to a specific state statutory scheme.

As the respondent points out, however, there are cases in which the United States Supreme Court has reviewed and upheld the constitutionality of capital sentencing schemes that do not require the jury to specify the mitigating circumstances it relied upon. Even in these cases this question is not directly addressed. *See, e.g., Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Absent a specific holding that the jury must specify what mitigating circumstances it relied upon, the Court declines to find Washington's sentencing scheme unconstitutional.

Second, Jeffries argues that because the jury was not required to articulate its findings, the Washington Supreme Court could not have properly reviewed his sentence. The Court believes this argument is without merit, for the following reasons. First, as noted above, articulated findings do not appear to be a constitutional requirement—if such findings were a prerequisite for a reasonable appellate review, then one might expect that the United States Supreme Court would have addressed this issue. More importantly, however, the Washington Supreme Court was

provided with a complete record of the trial court proceedings. The Court believes that this record is more than sufficient to enable the Supreme Court to resolve the issues it must consider pursuant to RCW 10.95.-130(2). Indeed, it is conceivable that a review of the entire record by the Court is more beneficial to the defendant than a review limited to those factors found by the jury.

Third, Jeffries argues that the jury should have been required to unanimously agree on the alternatives within the aggravating circumstances. This argument has already been considered and rejected. *See* claim 6.4, above, and 7.9, below.

The Court will deny claim 7.4.

### M. *Claim 7.5: Proportionality Review*

Petitioner has withdrawn his proportionality claim. The issue is therefore moot and will not be considered by the Court.

### N. *Claim 7.6: Ineffective Assistance of Counsel*

Jeffries contends that he was denied the effective assistance of counsel during the penalty phase of his trial. This claim contains three discrete allegations: (a) that counsel failed to investigate, present and argue certain mitigating evidence to the jury; (b) that counsel acquiesced in Jeffries' "uninformed" and "unknowing" decision not to present mitigating evidence; and (c) that counsel failed to submit any penalty phase instructions and failed to object to certain language contained in one of the penalty phase instructions.[7]

#### 1. Background.

The guilt phase verdict was returned on Saturday, November 5, 1983 at 12:31 p.m. The penalty phase, during which Jeffries was entitled to present evidence in mitigation, commenced on Monday, November 7, 1983 at 1:30 p.m. In the period between the return of the guilty verdict and the commencement of the penalty phase, Jeffries—after discussion with counsel and with his brother—decided not to present any witnesses in mitigation.

It is defense counsel's acquiescence in this decision that lies at the heart of Jeffries' ineffective assistance of counsel claim.

The only evidence introduced at the penalty phase was certain samples of Jeffries' artwork. Defense counsel had investigated and was prepared to present a case in mitigation. Several witnesses, including Jeffries' brother, two of his nieces, and his parole officer were available and willing to testify on Jeffries' behalf.

It is also clear, from evidence submitted by petitioner supplementing this Court's evidentiary hearing, that there was a variety of additional witnesses, mostly Canadian, who would have been willing to testify on Jeffries' behalf. *See, e.g.,* affidavits of Rich (niece), Dryden (parole officer), Lattimer (art gallery owner), Pitt (fellow inmate), and Watt (friend).

In general, this testimony falls into two broad categories: (1) witnesses who would testify as to Jeffries' non-violent character, helpfulness, ability to get along with children, as well as his difficult childhood, alcoholism and drug problems, and (2) witnesses who would testify as to the value and uniqueness of Jeffries' artwork.

#### 2. Analysis.

A claim of ineffective assistance of counsel is subject to a two-part analysis:

First, the defendant must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable.

*Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674

---

**7.** Petitioner has abandoned a fourth ineffective assistance of counsel claim relating to the failure to present certain information to the trial judge.

(1984). The reviewing court must evaluate the reasonableness of counsel's actions "on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690, 104 S.Ct. at 2066.

(a) *Failure to investigate mitigating evidence.* The record demonstrates that Jeffries' counsel had adequately investigated Jeffries' personal history and was prepared to present a case in mitigation. The testimony of the witnesses they intended to present would have covered substantially the same ground outlined above (*i.e.*, character witnesses and testimony about the value of Jeffries' artwork). To the extent that Jeffries is arguing that counsel was ineffective in this regard, the claim is without merit.

The thrust of Jeffries' position, however, is that by failing to present any mitigation witnesses, counsel improperly acquiesced in Jeffries' "unknowing" and "uninformed" decision not to present any mitigating evidence and in so doing failed to adequately represent Jeffries' interests.

■ (b) *Jeffries' decision not to present evidence.* Jeffries made his decision not to present mitigating evidence after discussions with counsel and with his brother. The initial, and most important, question is whether Jeffries made a knowing and informed decision. After having reviewed the record and having heard the testimony at the evidentiary hearing of defense counsel Sowa and Mestel, the Court concludes that he did.

Defense counsel Mestel told the trial court that:

> Mr. Sowa and myself both believe that our client is perfectly competent and that [it] is his personal decision after a weekend of soul searching, which has caused him to elect this course of actions. While we may not join in it, we believe that the decision is personal enough and made knowingly, voluntarily and intelligently that, as his counsel, we have no choice but to adhere to his wishes.

11 REC 3585–86. Both defense counsel repeated their belief that Jeffries' decision was knowingly and voluntarily made at the evidentiary hearing.

Perhaps the best evidence of the nature of this decision comes from Jeffries himself. While Jeffries has not testified under oath on this issue, he did speak to the judge in open court and also make an allocution to the jury at the sentencing phase of the trial. Jeffries told the trial judge:

> I still stand that I am innocent and I believe it and I have no reason to even ask God's forgiveness because I have done nothing and I certainly don't see any reason to beg for the jury or anybody else because I am innocent and that is how I stand and therefore I don't want to put my loved ones, like my relatives and friends, bring them up here and put them through this when I believe strongly that there is no valid reason to do so.

11 REC 3587. Jeffries essentially repeated this position in his allocution to the jury. 11 REC 3592–95. These statements, the Court believes, clearly demonstrate that Jeffries had articulable and reasonable grounds for declining to present mitigation witnesses.

Jeffries believed he was innocent and that presenting mitigation evidence might indicate a sense of guilt. In addition, he clearly wanted to protect individuals that he cared about from having to testify in court. These reasons—which other people might or might not agree with—are certainly a valid basis for declining to present mitigation witnesses. Absent any other evidence suggesting that Jeffries' was not competent to reach this decision, this Court will find Jeffries' decision to have been freely made.

■ The question now becomes, even assuming a conscious decision by Jeffries, were defense counsel bound to abide by his choice? On appeal, Jeffries is arguing that counsel erred in acquiescing with this decision and ought to have presented a case in mitigation despite Jeffries' stated desire not to do so. The Court does not agree.

■ To begin with, it is clear that Jeffries retained a measure of personal control over his defense. *See, e.g., State v. Jones,* 99 Wash.2d 735, 740, 664 P.2d 1216 (1983) (defendant has *constitutional* right

to broadly control his own defense). The Court believes that this measure of control includes, at a minimum, the right to decide whether to present a mitigation defense.

Jeffries argues, however, that because the decision not to present mitigating evidence was not "tactical" in nature, defense counsel were not bound to follow it. Counsel derives this proposition from the "informed strategic choice" language quoted in *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)). A review of *Strickland,* however, reveals that it does not speak in terms of tactical or non-tactical decisions, but in terms of a presumption that defense counsel has "rendered adequate assistance and *made all significant decisions* in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. at 2066 (emphasis added).

Jeffries also relies on the American Bar Association Standards for Criminal Justice (1980) to support his belief that defense counsels' actions were unreasonable and that they ought to have presented a mitigation case. As the Court in *Strickland* pointed out, however, the ABA Standards "are guides to determining what is reasonable, but they are only guides." *Id.* at 688, 104 S.Ct. at 2065.

A review of the ABA standards demonstrates how difficult it is to apply these guides in a specific situation. After setting forth the proposition that defense counsel is not the defendant's alter ego, but a professional representative of the defendant, the Standards provide the following advice:

> The decisions as to what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions to be made, and all other strategic and tactical decisions are to be the exclusive province of the lawyer after consultation with the client.

Standard 4–5.2(b). None of these specifics, however, parallels the situation in the present case. Jeffries' decision not to

present a case in mitigation presents a much more fundamental question—one which simply is not equivalent to the choice of cross-examining a witness or striking a juror.

Ultimately, the Court believes that the paradigm suggested by Jeffries is unworkable—it requires both defense counsel and the courts to intervene and attempt to determine what is in the best interest of the client on a very basic level. As such it opens up an avenue of appeal in virtually every case.[8] Rather than adopt this analysis, the Court finds that defense counsels' choice to abide by Jeffries' informed decision was reasonable. As such the first prong of the *Strickland* test has not been satisfied and the Court concludes that defense counsels' performance was not constitutionally defective.

(c) *Penalty phase instructions.* Jeffries contends that defense counsel erred by failing to submit any penalty phase instructions and failing to object to certain language contained in one of the penalty phase instructions. This argument has not been vigorously pursued and it is difficult to find much support for this aspect of the claim.

First, although there appears to have been some confusion as to whether Jeffries' proposed instructions were submitted to the Superior Court Clerk, it is clear from the record that defense counsel did submit penalty phase instructions, some of which were incorporated by the trial court. 11 REC 3598–99; 3588; 3559.

Second, Jeffries apparently believes that defense counsel failed to object to the wording of Instruction No. 3. The defense, however, specifically objected to this instruction and requested that the trial court delete the enumerated mitigating circumstances. This request was granted by the trial court. 11 REC 3591.

The Court will deny Jeffries' claim for relief number 7.6.

8. It is axiomatic that, had defense counsel presented mitigation witnesses over Jeffries' objections, an ineffective assistance of counsel appeal would have been made.

O. *Claim 7.7: Waiver of Right to Counsel*

Jeffries contends that did not make a "knowing and intelligent" waiver of his right to counsel.

1. Background.

The background to this claim is identical to that outlined in the previous section, claim 7.6.

2. Analysis.

■ Jeffries argues that he waived his right to counsel by participating in a "management" decision and instructing his attorneys not to call mitigation witnesses. This argument is without merit. The Court has already found that Jeffries' decision not to present mitigating witnesses was made knowingly and voluntarily. Thus, the crux of Jeffries' waiver claim is not present.

Moreover, it is not clear at all that this is a situation in which a defendant has relinquished his right to counsel and elected to represent himself pro se. Rather, Jeffries simply was engaged in directing the course of his defense. To characterize this as a waiver of the right to counsel is, in respondent's words "novel."

The Court will deny claim 7.7.

P. *Claim 7.8: Prosecutorial Misconduct*

Jeffries contends that the prosecutor's unconstitutional comments during his penalty phase closing argument compel a reversal of the sentence.

1. Background and analysis.

The standard for reviewing whether a prosecutor's closing argument violates due process is set forth in *Campbell v. Kincheloe,* 829 F.2d 1453 (9th Cir.1987). The Court in *Campbell* stated:

We agree that "[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." Every argument which stirs the emotions of the jury, however, does not render a sentencing proceeding unconstitutional. The Supreme Court has expressly approved the use of "open and far-ranging argument" during a capital sentencing proceeding. "We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision." What is important is a "focus on the particularized crimes and the defendant."

Mere improper argument does not necessarily violate a defendant's constitutional rights. An "examination of the entire proceedings" must be made to determine whether the prosecutor's remarks rendered the proceedings "fundamentally unfair."

*Id.* at 1457 (citations omitted).

Each of the grounds raised in this claim by petitioner is considered below.

■ (a) *Prosecutor's comment on petitioner's failure to testify.* Pursuant to Washington State Superior Court Criminal Rule 7.1(a)(1), Jeffries made an allocution to the jury. 11 REC 3575–77. In response, the prosecuting attorney opened his closing argument with the following statement:

Well, you have heard the defendant in a situation where he does not have to take an oath and in a situation that I can't cross-examine him and his statement, I submit is one that is insulting to the intelligence. It is also a statement, I think, full of arrogance.

11 REC 3600. Defense counsel offered no objection or curative instruction in response to the statement.

Simply put, the Court does not believe that this statement—which for all its hyperbole only points out an obvious fact that an allocution is not the same as testimony under oath—is so outrageous that it rendered the proceedings fundamentally unfair. The Court agrees with the Washington Supreme Court's conclusion that, at worst, the prosecutor's statement amounts to a rebuttal of Jeffries' contention that he was telling the truth. *Jeffries I,* 105 Wash.2d at 416, 717 P.2d 722.

■ (b) *Prosecutor's comment on petitioner's potential for appeal and due*

*process rights.* The prosecutor made the following comments during closing argument:

Ladies and Gentlemen, Mr. Mestel, when he talks to you about what you're about to decide, he speaks in terms of killing. I think he asked you to, he asked you to say I will not kill him. Why does he do that? Why does he use the word kill. Because he's attempting to equate your decision-making with what this defendant did. I mean, this defendant killed brutally and without mercy. If you decide that the death penalty is appropriate and, I submit it is, there is no comparison to the killing that he did and your decision that he should receive the death penalty. This man was arrested and was given due process of law. Phil Skiff and Inez Skiff didn't get due process of law. This man got a fair trial. He got two attorneys. He got resources, he got the benefit, everything that out [*sic*] system gives to a defendant, everything, and he got a fair trial and he will get more than that. He will get appeals, you name it, because that is our system and this system has treated him fairly. Something that he didn't do—he killed unmercifully, but our system gives him due process of law so don't think that you're killing him because you're giving him the law and you're giving him justice.

11 REC 3608–09.

Again, the Court, having reviewed the closing arguments of both parties and the record as a whole, does not believe that this statement renders the trial fundamentally unfair.

First, the comments were made in the face of defense counsel's repeated statements that it was the jury's responsibility to make the decision about whether Jeffries should live or die. 11 REC 3577–79. To the extent that the prosecutor's invoked an emotional response, it must be judged in this context.

More importantly, however, the penalty phase instructions make it abundantly clear that the ultimate responsibility for imposing the death sentence lies with the jury.

The prosecutor's passing reference to the fact that Jeffries was entitled to an appeal—a fact of which the jurors were undoubtedly aware—cannot reasonably be said to confuse the jury as to nature of its responsibility in this regard.

■■ (c) *Prosecutors comment that jury should "ignore the law."* The prosecutor stated during his closing argument that:

This man was arrested and given due process of law. Phil Skiff and Inez Skiff didn't get due process of law ... [H]e killed unmercifully, but our system gives him due process of law.

11 REC 3609.

The Court does not believe that this is an improper "eye for an eye" argument.

■■ (d) *Prosecutor's opinion on petitioner's guilt.* The prosecutor stated:

Well, ladies and gentlemen, you did the right thing [in returning a guilty verdict at the guilt phase]. You did the right thing ...

11 REC 3600. Because this comment was after the jury had already returned its guilty verdict, the Court does not believe that it improperly influenced the jury's sentencing decision or rendered the sentencing phase fundamentally unfair.

For the reasons outlined above, the Court will deny petitioner's claim 7.8.

Q. *Claim 7.9: Failure to Require Unanimous Verdict*

Petitioner argues that the trial court's penalty phase instructions were constitutionally deficient because they failed to instruct the jury that it must consider the two murder counts as if they were separate trials.

This claim is identical to claim 6.4 (failure to require unanimous verdict, guilt phase) and petitioner relies on his prior analysis for its support. For the same reasons outlined in the discussion of claim 6.4, the Court will deny this claim for relief.

**1556**

**R.** *Claim 7.10: Trial Judge Report*

Jeffries contends that because the report of the trial judge was prepared without any opportunity for him to be heard and contained certain errors or omissions, his death sentence was unconstitutional.

**1. Background.**

RCW 10.95.120 requires that in all cases in which an individual is convicted of aggravated first degree murder, the trial court shall prepare a report for submission to the clerk of the Washington Supreme Court. The report is to contain information concerning the defendant, the trial, the special sentencing proceeding, the victims, the representation of the defendant, "general considerations" and the chronology of the case. The report is informational and factual in nature and is intended to assist the Supreme Court in its proportionality review of the sentence.

The report is prepared after the trial and imposition of the sentence. The trial court is required to complete a standard questionnaire. Importantly, defense counsel were asked by the trial judge to provide information to be used in the trial judge's report, *but did not do so.* 16 REC 4947. Petitioner had another opportunity to respond to the report when it was submitted to both parties and the Supreme Court. Again, the record indicates that petitioner has not attempted to supplement the report.

**2. Analysis.**

■ On the record before it, the Court declines to find the petitioner's constitutional rights were violated by the preparation or content of the trial judge report. First, petitioner did not even attempt to provide the trial judge with the information which he now claims is essential to the validity of the report. Having passed up the opportunity to do so, petitioner's complaints carry little weight.

Second, the trial judge report has no impact on the guilt of the petitioner or the sentence he receives. Its primary purpose is to assist the Supreme Court in conducting its proportionality review. Petitioner,

however, has specifically abandoned his proportionality claim for relief (claim 7.5, above). Thus, even assuming the trial judge's report contained errors or omissions, there is clearly no prejudice to the defendant.

To the extent that the trial judge report is used by the Supreme Court to evaluate whether there is sufficient evidence to justify the jury's penalty phase verdict or whether the sentence was brought about through passion or prejudice (unlikely given the nature of the information in the report), its impact is completely diluted by the fact that the Supreme Court has the entire trial court record available for review.

The Court will deny claim 7.10.

**CONCLUSION**

THEREFORE, for the reasons outlined above, respondent James Blodgett's motion for summary judgment is GRANTED. Patrick James Jeffries' petition for habeas corpus relief is DENIED.

The Court's July 6, 1990 Order staying execution is hereby DISSOLVED.